[No. 37151. Department One. June 4, 1964.]

CLYDE STRICKER, INC., *Appellant,* v. P & B COMPANY OF WASHINGTON, INC., *Respondent.**

*Wellman Clark,* for appellant.

*Keith, Winston & Repsold,* by *Michael J. Cronin,* for respondent.

HILL, J.—This is a purely factual appeal. The facts are well set forth in the following unchallenged findings made by the trial court:[1]

"That at all times material to this action the plaintiff corporation [Clyde Stricker, Inc.] did business in the Spokane area as a specialty subcontractor doing floor covering work; and the defendant corporation [P & B Company of

*Reported in 392 P. (2d) 804.

[1] We have made some minor changes in the wording, primarily to avoid repetition, but there is no change in substance.

Washington, Inc.] engaged in construction work in the same area as a general contractor." Finding No. 1.

"The Liberty School District advertised for bids for the construction of a new high school and set the bid opening time as 3:00 P.M., Thursday, July 21, 1960." Finding No. 2.

"The plaintiff examined the plans and specifications for the school job at the Spokane Construction Council, a contractors' service agency, of which plaintiff is a member, some time prior to July 19, 1960, and made its calculations for its subcontract bid to the defendant from those plans and specifications." Finding No. 4.

"July 19, 1960, the architects added Addendum G-1 to the General Specifications which modified those specifications with reference to rooms 46 and 46A in the proposed school by changing the floor covering in those rooms from asphalt tile to a more expensive type floor covering, namely, vinyl sheet." Finding No. 5.

"The defendant planned to submit a bid for the school job to the Liberty School District, which fact was known to the plaintiff, causing the plaintiff to volunteer an oral bid to the defendant to do the basic floor covering work in the school building for a sum of $5,640.00; that in addition to the defendant, the plaintiff submitted flooring bids to five other general contractors bidding the school job." Finding No. 3.

"At the time plaintiff gave defendants its oral bid of $5,640.00 on the floor covering work, which bid was transmitted to defendant by telephone at approximately 12:00 Noon on bid opening day, July 21, 1960, the plaintiff was not aware of the existence of Addendum G-1, although the same was received by the Spokane Construction Council on July 19, 1960 and was available at that agency for the plaintiff's information and use; that subsequent to preparing its bid, plaintiff failed to check back with the Spokane Construction Council or any other source of information to determine if there had been any addenda to the basic specifications for the school job before telephoning its bid to the defendant." Finding No. 6.

"At all times subsequent to its publication defendant was aware of the existence of Addendum G-1, but was not aware that plaintiff was ignorant of such addendum at the time it received plaintiff's telephone bid or subsequently entered into the written subcontract with the plaintiff." Finding No. 7.

"On July 21, 1960 the defendant completed the preparation of its bid to the Liberty School District in which it

incorporated the plaintiff's bid price of $5,640.00 on the floor covering items and such bid was then submitted to the School District shortly before bid opening time of 3:00 P.M. on that date; that defendant was the low bidder and was subsequently awarded the job and the contract therefor was executed by the defendant and the School District on August 17, 1962; that subsequent to that date the defendant prepared a subcontract for the floor covering work, to be signed by the plaintiff, which was mailed to and signed by it on August 22, 1960 and returned to the defendant." Finding No. 9.

"In February or March, 1961, at a time when construction of the school had progressed to the point where the floor covering was called for, the plaintiff became aware, for the first time, of Addendum G-1, which required the substitution of vinyl sheet for asphalt tile in rooms 46 and 46A; that realizing that such substitution of materials would materially add to the costs of its subcontract, the plaintiff objected to the furnishing of the vinyl sheet required by Addendum G-1 without an adjustment for the increased cost from someone and was advised by defendant's attorneys that it was required under the terms of the subcontract to install the vinyl sheet; that plaintiff did not demand increase in the subcontract price as a condition precedent to performance but did complete the contract including Addendum G-1." Finding No. 14.

"Plaintiff fully performed the work required by its subcontract; that on July 12, 1961, a date subsequent to the completion of said work the plaintiff billed the defendant for $928.00 representing the price differential between installing asphalt tile and vinyl sheet in rooms 46 and 46A; that the defendant refused to pay such amount. . . ." Finding No. 15.

This action was brought by the plaintiff to recover the $928 difference in the cost between the asphalt tile floor covering and the vinyl required by Addendum G-1.

From a judgment dismissing the plaintiff's cause of action, it has appealed.

As the trial judge said, "Essentially the question is, who must bear the loss because of the plaintiff's honest mistake?"

The written subcontract between the parties leaves no question as to the plaintiff's obligation to furnish labor and

material for *"All composition flooring per plans and specifications, div. 13.01 thru 13.03."* The subcontractor agreed:

"(a) To assume toward the CONTRACTOR, so far as the SUBCONTRACT work is concerned, all the obligations and responsibilities which the CONTRACTOR assumed toward the OWNER by the MAIN CONTRACT which includes the general and special conditions thereof, and the plans and specifications and addenda, and all modifications thereof incorporated in the documents before their execution (which documents shall be available to the SUBCONTRACTOR)."

▮ If the defendant has any liability here, it must be because it owed a duty to the plaintiff to specifically direct its attention to Addendum G-1, substituting the vinyl for asphalt tile. Specifically, the plaintiff claims that, according to a custom prevailing in the Spokane area, general contractors include in the contracts prepared for their subcontractors, along with reference to plans and specifications, a reference to any addenda by letter and number, as G-1.

The trial court gave thorough consideration to the testimony on the issue of the existence of such a custom and, in appraising this testimony, said:

" . . . Plaintiff established beyond any doubt in its exhibit 4 that many reputable and substantial contractors in their sub-contract form, specifically mention any addenda. . . . it is the custom in this locality, in trade usage amongst some general contractors at least, to specifically mention any addenda in the sub contract by number or letter, rather than merely rely upon the printed references in the agreement to possible addenda. On the other hand, testimony by an officer of the Association of General Contractors, indicated that while it was the custom and usage in the community for some general contractors to so specifically mention addenda, nevertheless amongst other contractors it was not customary and that actually the custom was optional. In support of the optional aspect of said custom, there was produced evidence, defendant's exhibit 9, which showed in a previous agreement between the defendant and the plaintiff, dated July 8, 1960, with the KHQ building, addenda which actually existed and were honored, but which were not specifically mentioned; also an agreement, defendant's exhibit number 15, for remodeling of Mead School which involved a contract between the defendant

and the plaintiff, where there was addenda which was again honored but not specifically mentioned in the sub contract.

"Essentially the question is, who must bear the loss because of the plaintiff's honest mistake. The defendant might be held to the loss if, under the circumstances, he owed a duty. No such duty appears.

"The court finds that there is no common trade usage or custom binding in the community which binds the general contractor to notify the bidders of all addenda, or even of the accuracy of their bid. Further, that there is no custom or usage in the community which is binding upon all contractors that a sub contract agreement must specifically refer by number or letter to any possible addenda. . . ."

There is substantial evidence supporting the only challenged finding of fact:

". . . that there is no common trade usage or custom in the Spokane, Washington area which requires general contractors to notify subcontract bidders of addenda, of the accuracy of their bids or which requires subcontract agreements to specifically refer to existing addenda by letter or number." Finding No. 17.

While we do not retry factual issues (see citator on *Thorndike v. Hesperian Orchards, Inc.* (1959), 54 Wn. (2d) 570, 343 P. (2d) 183), we have no hesitancy in saying that the evidence here falls far short of establishing a general trade usage or custom of the character claimed by the plaintiff.

The trial court concluded its opinion with this analysis:

". . . The general contractor cannot be held responsible for failure of the sub to obtain the addenda, which were available to the plaintiff, and which, apparently, was considered by other subcontractors who bid on this job. The responsibility must rest upon the person who relys upon the specifications, not someone else. There is nothing secret about this information. It is available to all, and presumably considered by all. This job involved a bid of somewhat over $400,000.00, defendant's exhibit 18, and possibly some fifty prospective subcontractors. . . .

"The sub contract, as executed, is not ambiguous and is binding. It specifically mentions possible addenda. The subcontractors, thus, have notice. If it is charged that defendant should have known of the mistake because of the low bid, then so should plaintiff have been alerted, because it received a call from defendants inquiring respecting the ac-

curacy of the offer. More than a month elapsed thereafter before a binding agreement was signed. Addenda are not strange or unknown to plaintiff, and if defendant should have thought of that possibility, so should plaintiff."

We must agree with the trial court's conclusion that the defendant breached no duty it owed to the plaintiff. The judgment of dismissal is affirmed.

OTT, C. J., ROSELLINI, HUNTER, and HALE, JJ., concur.